The evidence presented in Martin Araiza-Jacobo's trial presented the jury with a binary choice. Either Martin knew about the drugs hidden in the two candy bags he agreed to take across the Gateway Border Bridge, or he didn't. Our argument on the field is simple. The fact that the evidence presented only this binary choice—excuse me. The fact that the evidence presented only this—because the evidence presented only this binary choice, instructing the jury to deliver the ignorance was error. And that error was harmful because the government's case as to actual knowledge was equivocal, not substantial. And more importantly, because the prosecutor expressly urged the jury to use the delivery of ignorance disruption improperly—that is, to dilute the government's burden of proof. In fact, what the prosecutor argued to the jury was that even if Martin actually did not know about the drugs in these candy bags—a fact that should have entitled him to acquittal— he was still guilty because he should have known that the drugs were in these candy bags. Now, I'm going to first address the error—the instructional error in this case, and then I'm going to move on to the reasons why we think that this record—that error merits reversal. As to the first point, Your Honors, the jury should not have been instructed on delivering ignorance in this case because the evidence suggested that Martin either knew or didn't know about the drugs in these candy bags. JUSTICE KENNEDY In fact, our case law says that instruction should rarely be given. Isn't that right? Absolutely, Judge Smith. The instruction should rarely be given because, in every case, it presents a serious risk that the jury is going to rely on that should-have-known diluted standard of knowledge. It's different than the deliberate indifference instruction or standard that was in the case just before you now. Deliberate ignorance requires even more. Deliberate—the key, as this Court has said, or the sine qua non, as the Court stated in the United States v. Mendoza, Medina in 2003, is conscious avoidance of already suspected facts. Well, what significance should we give to the fact that—and correct me if I'm wrong—that the border agent took 12 seconds to see that there was something wrong with the candy? Your Honor— Is that right? No, I'm sorry. Is that correct? Had your client been a cruisador for some time? I don't know if he was a cruisador in the auto candy mix like the bags that were at issue in this case. But the more fundamental point is that the evidence in the record that was actually submitted by the government, Mr. Estrada, the fellow at Rosser, indicated that this very request was non-suspicious. And it is true that the agent says that he saw—we take that as a no—we have to credit that to the delightful spirit of the government. But the fact that he saw these drugs quickly does not mean he didn't see drugs. The fact that he noticed that some of these candies weren't matching the outside of the bag, although some were, simply doesn't rise to the level of a glaringly suspicious fact or discrepancy that an ordinary individual would look at. I watched some—three of the government's exhibits with the court today that demonstrate that those are just pictures of these candy bags. job, that particular transportation. And yet in this case, we have—your client received the call and apparently spoke to this person on the other side some six times or more without learning a name. I mean, can it be that it's a totality of the circumstances that we reach a critical mass where we say, well, now he's being deliberately indifferent to what is staring him in the face? Or is that only actual knowledge? Well, the answer—there's several answers to your question. You do look at the totality of the circumstances. You look at all the evidence, and you can decide whether or not the evidence suggests two things, that there was something that put the defendant on actual notice that the—of the fact that he's supposed to know in order to be guilty under the statute. That fact here is that there were drugs in these bags, not just that there might be something weird about these bags but that there were actually likely drugs in those bags. And the evidence also has to support a reasonable inference that the reason that the defendant chose to do something or not to do something was because that he knew that if he did or if he acted otherwise, he would learn the thing he didn't want to know. And so the thing—the most important part about this case and the testimony that you mentioned is that Jesus Estrada, the fellow crosser, did say that he decided not to accept this job. But he didn't say he decided to—not to accept it because he was suspicious or that he thought anything was off about it. On the contrary, he said it is not unusual for somebody who sits around at the placita and waits for crossing jobs to have their numbers spread out around the town and to get calls from people who they don't know. Now, it is true that there were several calls. I don't think it was six, Judge Englehardt. I think it was maybe three or four over the next couple days. But the fact that there were additional calls simply raises the binary question. Either he was—either later after the initial conversation where he indicated to Estrada that he believed that he had accepted a job to cross candies, he later talked to the unknown man and the unknown man revealed that this was a drug smuggling enterprise, or he simply didn't know. I mean, in the duration of the calls, he could have been on hold for all we know. He could have called the unknown man and somebody said, hey, wait, I'll go get him, and we don't know. Remind me, does the record reflect how much he was paid to cross these? Well, the record—if you resolve the evidence in favor of the government, then the entire $400 that he had on him was the amount, but— Well, that's the amount of money he had on him. That's the amount of money he had on him, but that's absolutely consistent with the entire bank account of an individual who's living basically couch surfing and crossing groceries at a bridge day to day. And there also was the testimony in his interrogation. He made quite clear from the very beginning that that money was being used to save for a new permanent resident card. In fact, the actual agent who recognized the drugs in the bags is the same agent who had twice before reminded him you need to get a new permanent resident card. And the record reflects that it's several hundred dollars. Was he going to get the card that day? I mean, why would he carry that? I was wondering when I read the record, and it's not argued, but assuming that that's the purpose that he had the money, he's carrying it on his person. If he's saving it up to get a renewal of the card, that may make sense, but why would he carry it on himself? Well, Judge Engelhardt, I'm not sure I have complete ignorance on this, but I don't know if you can actually go and get a new permanent resident card at the bridge. I would doubt that you're able to do that there. I think there would probably be another office that you would have to go to in order to apply to get a permanent resident card. But the reason why it's perfectly reasonable for him to have that amount of money he had on him is that there's no evidence in the record he has a bank account. And, you know, cruisadores, they keep cash on them. That's what they trade in, and that's what happens, and it's just not strange. And that amount of money, it would be very strange for a 55-year-old cruisador who had LPR status, who had never had any criminal history in his life, and who was recently married to a state probation officer and had kids with her to decide to risk everything for $400 and agree to smuggle drugs. And for Martin to be guilty in this case, that's what would have to have happened here. I don't want to interrupt your train of thought, but I just want to make sure you get to the harmless error point while you still have time. Absolutely. My colleagues may have other questions about the error, but I certainly want to hear your argument about why, even assuming you're right, there isn't substantial evidence of actual knowledge in the record so that the error is harmless. Absolutely. And we do think that that is the crux of this case is the question of whether or not it's harmless error. Now, it's no secret that this court has not since 1994 reversed a conviction based on an error in giving its liberty or its instruction. The reason for that is that most of the time the instruction is asked for when it's just absolutely not called for. And obviously we contend that that's the case here, but in many of the cases, the evidence that the defendant knew is just airtight. That's not the case here. The evidence here is equivocal as to Martin's actual knowledge. As we explained in our briefs, everything that the government pointed to when it was giving its closing arguments, the jury, the phone calls, everything like that, that suggests actual knowledge has an innocent, reasonable explanation. And so while you have to resolve those inferences in favor of the government with respect to sufficiency of the evidence and even with respect to deciding whether the instruction is appropriate, by harmlessness, you don't. By harmlessness, you can look at the evidence for what it is. And that evidence, each of it, was equivocal. Martin put on a good face of defense that he did not know in this case, and it was corroborated in multiple different ways by multiple government witnesses, including Estrada and Nora Torres. He did go and get a torta and a frank sandwich from the other side of the border. And so a lot of what he said was absolutely corroborated. But I'd like to focus it toward, as far as the evidence, on two local observations here. The first is that, if you zoom out, the case really was tenuous. As I described, this is a 55-year-old prosecutor with LPR status who decided to give up everything, in the government's case, if the actual knowledge was correct, in order to receive $400 at most in return. That is a very – and really, in order to support the prosecution here, the evidence just simply did not suggest that Martin was – or the evidence is very equivocal. And it does provide for the reason, I believe, that Martin did actually not realize what was going on here. In his own terms, that he was an idiot and that he was used for an interrogation. And I'm going to move to the second point I'd like the court to focus on here. It's just how rare it is for a defendant to withstand a four-hour interrogation like the one with Sir Roger DiCocco, who endured here, and steadfastly maintain innocence. I mean, throughout the entire interrogation, it is a confusing transcript that goes throughout, granted that partly because that's due to the agent's interrogation tactics. But throughout the entire thing, he maintained, I did not know about these drugs. There's no other truth. I can tell you. And the agents, they did not hold back. They used all the evidence in the book. They lied to him. They told him there was more evidence than there wasn't. They ceaselessly used him and lied to himself. They didn't believe a word he said. They told him that he would give me incense if he confessed. And then they threatened him that they would tell the judge and the prosecutor if he didn't confess. And throughout all of these things, Mark continued to say that money was for the permanent resident card. I didn't know about the drugs, and I had looked at those bags, which, by the way, is the critical fact in demonstrating why there's no deliberate ignorance. The fact is that he did actually confess, and we can't have deliberate ignorance based on the idea that he didn't confess. But, you know, and we said this in our brief. The crux of this case and the reason why the jury should not be confident that the jury relied only on evidence of actual knowledge here and didn't rely on deliberate ignorance instruction to resolve the case is the prosecution's use of deliberate ignorance instruction. And specifically, the prosecutor listed testimony from agents stating he replied that Mark had a duty to know about these drugs, that they would expect him to inspect the bags as thoroughly as he did. And he specifically asked the jury to embrace the should-have-known theory of knowledge of the prosecutor. In both the opening and closing rebuttals, he specifically told the jury, even if you try to resolve all the cases in favor of Mark, even if you believe he didn't know, he's still guilty under the deliberate ignorance instruction. It's as if the prosecutor pulled the reasons why deliberate ignorance instruction shouldn't be given out of this court's case law and dropped them into the closing argument. That's how – and I'm not making suggestions in that faith on the part of the prosecutor here. I think it was just confusion about the law. And that's why this case presents people with an opportunity to address that type of confusion. Thank you. Thank you, Mr. Hedges. You've saved time for a vote. Mr. Berry? I think I asked you this last time. How many First Circuit arguments do you have? I'm Richard Berry from the United States. I've had the pleasure of being here approximately 70 times since 1985. Richard Berry from the United States. At least in court. If I could, I'd like to try to answer Judge Schoenberg's questions and also put this in a slightly broader context. The deliberate ignorance instruction is appropriate only where the defendant is objectively aware of a high probability that the evidence is correct. And the purpose of the failings, the purpose of the conconvening, is to avoid warning of that conduct. Now, to address Judge Duncan's question, put this into a broader context. Some of the best evidence came from Mr. Roriza's friend, Mr. Sousa Strada. Mr. Sousa Strada said he had known Mr. Roriza for years. They were friends. They were cruisers. They were border crossers. And they hung out at the La Placita small plaza on the west side of the river in France. An unknown man called Mr. Strada on January the 16th and said, Take a box of candy, get it in the auto, cross the bridge, bail it, or FedEx it or UPS it to Atlanta, Georgia. Mr. Strada said that he would not do so. On directing a cross-exam, Mr. Strada put all those secrets to bed. First, he said that he was illiterate. He had never shipped anything in the United States. Second, he said that people call him and say, I have a small box. Invariably, they show up with a much larger box, requiring a greater yield, a greater expenditure of energy and time. And third, and most importantly here, Mr. Strada explained whether patiently and carefully, he had a very simple, very pragmatic, very useful universal rule. If you want me to take something across the border, tortas or sandwiches or a bag of M&A's or whatever it is, you tell me precisely what you want. You give me the money. I, Jesus Strada, go to the store or the restaurant or some other location and buy the object. That way, I am not taking an unknown commodity I'm close to obtaining. That way, I, Jesus Strada, have some level of confidence that I know what I'm taking across the border. Because not only the person, but every single human being over the age of six living along the border between the United States and Mexico is aware of the drug problem. Specifically, cartels trying to ship drugs from Mexico to the United States. Jesus Strada testified equivocally. He told everybody he knew about that rule. If you want something, you tell me what you want. You give me the money. I'll go to the store. I'm not taking a closed container, partially closed container across the border. So I don't mean to interrupt you, but it sounds like that line of argument goes to his objective knowledge. He should have known something was up. But what about the second part of the deliberate ignorance trigger, which as I understand it is that there be evidence of a purposeful contrivance to avoid learning of the illegal. So I'm kind of sure, you know, he's willfully blinding himself to what's actually going on here. And you need that, right, to get this instruction? Yes, Your Honor. Okay. I'll move to that. Sure. Thanks. As Judge Engelberg said and as Agent Garcia testified, there were seven phone calls between Mr. Araiza and the unknown man on the telephone between January the 12th and the 17th. The 16th, if I'm not mistaken. I think you're right. The 16th and the 19th. The unknown man called Strada. Araiza heard that Strada was not going to take the package. Araiza asked Strada for a phone number and Strada gave it to him. Araiza then left Strada's presence and walked out into the center of the plaza and had a conversation with the unknown man. The unknown man called Strada six more times. Araiza's call to the unknown man was two minutes and 30 seconds. Six calls from the unknown man to Araiza are 12 minutes and 30 seconds. Roughly 14 minutes and 30 seconds of phone conversations. In and of itself, why would you need that long to say what you're going to do? Seven bucks, take two bags of candy, down the road, some other location and get with a no-show father. It's a ridiculous amount of time for a very simple transaction. Thank you for spending your time. We appreciate it. Steve, what do you think? What do you think the package was worth? Well, forgive me. I mean, you'll correct me if I'm wrong, but wouldn't that be evidence that he did, in fact, know there was something wrong and not evidence that he was purposely contriving not to know it? That would be evidence that he did, in fact, know there was something wrong. But he purchases two torches for a friend of his in Brasov and takes two bags of candy on the 17th, goes to the second station, the pedestrian lane, and walks up to Agent Garcia. Now, a riser has to have the two bags of candy from the point when he got them on FITA up to when he arrives at the inspection station. Precisely as Judge Abelhard said, according to the timestamp in the video, Agent Garcia has the bags for less than 12 seconds. In less than 12 seconds, he recognizes, First, the bag is too heavy. It says 4.4 kilos of candy, of el pepero, and not a candy. And Garcia testified the bag was too heavy. Second, Garcia testified that the bag didn't feel right. It felt odd. Third, there's a plastic window on the bag. You can see the candies inside the bag. Agent Garcia recognized that some of the candies in the bag were not as heavy as the candies on the outside of the bag surrounding all of the other candies inside. Fourth, Garcia recognized that the candies not depicted on the outside of the bag but visible inside the bag were, A, larger than the other candies, and, B, much, much harder than the other candies. Finally, Garcia recognized that the large, hard candies not depicted on the outside of the bag were supposed to be watermelon and lemon pop-up. Watermelon lollipops, I beg your pardon. But none of them, not a single one of them, outstanding. At that point, the suspicion was aroused. He called his partner, Agent O'Sullivan. O'Sullivan comes over. They have a brief conversation. O'Sullivan agrees. O'Sullivan, you're right in the mirror. Let's go to the x-ray. To no one's surprise, when they ran the two bags through the x-ray, both bags showed a number of anomalies, specifically the larger, unidentified candies were much, much darker on the x-ray, meaning they were much more dense than the plain sugar candy inside the two bags. At that point, they decided to open the bag. At that point, Agent Garcia and Agent Ozuna realized the two grown men couldn't pull apart the heat seal on a simple plastic bag, so they took a knife and cut the bag open. Then they realized that the reason they couldn't open the bag by hand was both bags had previously been opened. And Mr. Allen graciously provided photographs, and I certainly should have provided them as well. At the top of the bag, you can see L. Kim's character. The bags had been opened. The bags had been resealed. And when they were resealed, a great deal more plastic was melted to make the seal that originally was the case. That's why they opened it. I know the record says that it was about half a million bucks worth of meth that was recovered. Is that right? I believe it is. The final kilos are 98%. I was going to ask about the weight. I mean, so how many kilos? So, okay. So the bag that I'm looking at here says 4.4 kilograms. Does that mean that the actual weight of the bag is how much more than what the outside reflects? It should have weighed 4.4 kilos. I do not know if the drug smuggler removed legitimate candy as a penalty for this. Sure. But Agent Garcia testified without hesitation. When I picked it back up, I realized it was too bad. That was the first thing that caught my attention. They opened the bag and then opened one of the candies. And at that point, they noticed, Agent Garcia and Agent Hudson, they noticed a crispy little substance. Mr. Weiser, standing on the other side of the table, the inspection table at the end of the x-ray machine, and he volunteers that salad ball, a salty one, and he delivered this to Agent Garcia. Agent Garcia testified he and Agent Hudson had both seen and tasted the salad ball, and they immediately knew the substance was not salad ball. It has to have been adjusted positively. Counselor, let me ask you, getting back to Judge Duncan's question regarding the purposeful contrivance to avoid learning of illegal conduct. Would that exclude upon being apprehended or questioned by law enforcement either denying knowledge or lying about it once a person is caught? I understand his argument that he was telling the truth and denying, but a person who's confronted by law enforcement could deny knowledge or outright lie about it. Is that also within the realm of this purposeful contrivance, or does it take some other affirmative act in execution of the crime in order to constitute purposeful contrivance? No, sir, Your Honor. That is not excluded in any way, shape, or form. That would be part of the continuing effort to conceal the criminal conduct. I did not learn anything. I do not know anything now, and you are not going to tell me anything, as one of the early cases from this Court says. It is literally a continuation of the I don't want to know approach, which justifies the delivery of this instruction. And in terms of willful contrivance to avoid discovery, in seven phone calls, Ariza never learned the man's name, never learned any information whatsoever, acquired what seemed like an inordinate number of calls for a very, very simple transaction, all of which begs the question, incidentally, that there was no need to transport two bags of candy across the border. You can go to any of at least a half a dozen different stores in Brownsville and get exactly the same bags of Jalapeno Terria pinata candy. In any event, when questioned by Agent Garcia, Mr. Ariza said, here's the deal. I know nothing. I'm innocent. I was a tool. I was used by the man with no name. I looked at the bags, and he told this at least a half a dozen different times. The entire video was on. The entire interview was on video. I looked at the bag. The bag had candy. The bag was sealed. The gentleman looked trustworthy, and so I took it. As Judge Inglehart said, in 12 seconds, Agent Garcia noticed that the bag was too heavy. The bag didn't feel right. The bag had candy inside that wasn't depicted on the cover of the bag. The candy inside that wasn't depicted was very hard, and the candy inside that wasn't depicted was supposed to be lollipops, but not a single one of them had a stick in it. Twelve seconds to identify five factors that should have raised some suspicion in Ariza's mind. He maintains his story during the interview. I know nothing. I was used. I'm a fool. At some point, he realizes that Agent Ozuna and Agent Garcia are very interested in crystalline substance. A drug-candidate detection canine arrives and alerts to both bags. At that point, Special Agent Garcia said, Ariza nearly passed out. He became extremely nervous, which clearly shows prior knowledge of guilt. He maintained his innocence. He never testified at trial, although, as Judge Smith said in Salcedo-Munoz, not testifying shouldn't foreclose us from getting deliberate and ignorant instructions when we have met both prongs of the test. As to the error analysis in response to Judge Engelhardt's questions proposing counsel, the circumstantial evidence in this case was extremely strong. The large number of phone calls, the absence of any information whatsoever about the mystery man on the phone, taking the bags across the border after a cursory examination. And he didn't even say to Agent Garcia, I felt the bags. I grabbed the bags. I inspected the bags. I looked at the bag. It looked okay. I looked at the gentleman. He looked okay. And so I took the bag across, particularly in the face of Jesus Estrada's statement that I don't take anything across the border in a sealed container or in a closed container. Tell me what you want. Give me the money. I will go and get it and take it across. Have you moved on to talking about harmless error yet, or are we still on? Yes. The instruction is amenable to a harmless error analysis, and the error is always harmless if there's substantial circumstantial evidence, which is precisely the case here. The same circumstantial evidence that shows guilty knowledge shows that the error, if any, was harmless. Do you agree with opposing counsel that in the harmless error analysis, we are not allowed to resolve the evidence in favor of the government, that there's a different burden, so to speak? Or what is the burden? Well, we have the burden to show that the error was harmless. Okay. Sorry. Go ahead. Well, if there was any error, it is essentially the same evidence that shows that the error was harmless. Sure. So if we assume, let's just say hypothetically we find that there was error in the instruction. Is it a problem for the harmless error analysis, what opposing counsel said, that the prosecutor was emphasizing the deliberate ignorance instruction in order to find knowledge? Is that a problem for you? If not, why? I would certainly yield to opposing counsel's superior knowledge of the closing argument in the record. I have not examined it, and I apologize for it. However, we are allowed to rely on the district court's circuit-patterned instruction. What the lawyers say to the jury is not evidence, and this court certainly assumes that the judge was following the district's instruction. At sentencing, Judge O'Vara himself eviscerated any doubt by saying to Mr. Bison, you have been transporting drugs for a long time. You've been a drug carrier for a long time. And he later gave you a 60% downward variance from the guideline that does the minimum sentence of a 5-month sentence. Does that answer your question? All right. Thank you, Mr. Berry. Thank you. Thank you. Mr. Houser, is there time for a vote? All right. I have a couple of things to get to here. First of all, as to Estrada's testimony, those accounts are correct. He did say in his ruling that he doesn't like to take things from the Mexico side over to the U.S. side because of this general risk. But he also testified that other crossers have other rules. Martin is another crosser. And he recognized that some people will take those things over. It just depends. We don't dispute here that even Martin had knowledge of the general risk. But general risk is not enough. That is negligence. That is recklessness. Conscious disregard of a known risk is not deliberate ignorance. The Supreme Court made that clear in 2011 in global tech compliance versus SUD. So certainly Estrada's testimony is not overwhelming evidence or even evidence of deliberate ignorance at all. Judge Duncan, you were right about the weight. There's 5.1 spread between these two bags. So it was actually – it did conform to the 4.4 on the front of the record sites for you. Garcia actually clarified in cross-examination, the row of 403 and the row of 442 and 443, that it was not the weight of the bags that aroused his suspicion. It was the non-conforming candidates. But it was not the weight. Say those again. Forgive me. I didn't get your numbers down. Oh, I'm sorry. The row of 403 and 442 and 443. Okay. Thank you. Also, those sites are in our brief. We expressly take care of that in the brief. Thank you. Also, Judge Duncan and Judge Englehart, you both asked where's the evidence of a purposeful act here. The government wasn't able to point to a purposeful act. And that's because there was no purposeful act to do that that suggested an avoidance of something that they actually suspected. And it has to be drugs. It can't just be thinking that something fishy is up with these facts. Something has to put a blind eye to that actually, that those candies had drugs. And it's very clear from the testimony in this case, that the agents didn't suspect drugs as opposed to some other type of contraband. The second thing I opened, the disguised candy wrappers and powder came out. That was when they realized it was drugs. It was hard. It could have been component parts to the evidence, I suppose, or computer chips or whatever else is gone. But regardless of the agent, it took the agents all the way to open sealed bags of other candies before they realized there were drugs in there. So Martin could not see or realize that there were drugs in these non-informed candies, even if he had recognized them. There's no evidence that he had. Just by looking at the facts. That's not deliberate ignorance. And to James O'Hara, the supposed lying in the interview is not an act of purposeful avoidance. How could he possibly avoid learning after he's already been told he knew about the drugs at that point in the interview? So he wasn't avoiding learning about the drugs by saying he didn't know about them in the first place. Now, you might look at the evidence of his actual knowledge and resolve and say, well, that could be evidence of suspicion, too. But there's got to be that purposeful act. The only act of evidence in this record is that he did his job. He just did a bad job. And that goes to the heart of this issue, your Honors, is that the government didn't just get up here and argue that – again, I wrote it down – that Martin should have – that these suspicious factors should have raised some suspicion in his mind, should have known he did not stand there. That is, he included burden of knowledge and he did not submission to supporting conviction under any of the statutes of the four charges of conviction here. And the government said, again, here in New York, just like the prosecutor said to the jury below, he should have inspected further. He should have briefed the bags and he should have, you know, felt the candies inside the bag and done all of these things that they trained him to do. He just – that is not forgiveness. That he should have done. And Judge Meldrum, as to your question about the closing argument, this Court has held numerous times that a prosecutor's statement and closing argument can tip the balance in favor of adding prejudice. We cited the Fairley case from 2018 in our briefs. I can also, out of memory, from a different case, cite the United States v. Fortenberry. That's a 1988 case where the prosecutor – it's a 404B case – and the prosecutor expressly argued propensity to the jury. And the Court, of course, said you can't argue propensity to the jury. And when you do that, that's prejudicial. And if there's no further questions, Your Honor, I think you'll see in the case. Thank you, Judge. Your case is under submission.